AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED

for the

JUN 1 5 2018

Southern District of California

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    TY

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>LG Cellular Phone/ IMEI:357017-08-291614-2<br>Seizure No. 2018250600066201 | )<br>)<br>)<br>)   Case No.   **18MJ3350**<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952 and 960 | Importation of a controlled substance |

The application is based on these facts:
See  Affidavit of Special Agent Errol R. Watson , which is hereby inorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Errol R. Watson, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/15/18

_____
*Judge's signature*

City and state:  San Diego, CA

U.S. Magistrate Judge William V. Gallo
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

Black LG Cellular Phone
IMEI: 357017-08-291614-2
Seizure No. 2018250600066201
**(Target Device)**

The **Target Device** is currently stored at 9495 Customhouse Plaza, San Diego, CA 92154.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of January 20, 2018 through March 23, 2018.

     a.    tending to identify attempts to import cocaine, or some other federally controlled substance from Mexico into the United States;

     b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of cocaine or some other federally controlled substance from Mexico into the United States;

     c.    tending to identify co-conspirators, criminal associates, or others involved in the importation of cocaine or some other federally controlled substance from Mexico into the United States;

     d.    tending to identify travel to or presence at locations involved in the importation of cocaine or some other federally controlled substance from Mexico into the United States, such as stash houses, load houses, or delivery points;

     e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

     f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

which are evidence of violations of Title 21, United States Code, §§ 952 and 960.

1

2

3

4

5

6

7

8

**AFFIDAVIT**

I, Errol R. Watson, being duly sworn, hereby depose and say:

**INTRODUCTION**

1.    This affidavit supports an application for a warrant to search the following:

    a.    Black LG Cellular Phone
           IMEI: 357017-08-291614-2
           Seizure No. 2018250600066201
           **(Target Device)**

as described in Attachment A, and seize evidence of crimes, specifically, violations of Title 21, United States Code, Section(s) 952 and 960 – Importation of Controlled Substances. This search supports an investigation and prosecution of Maria Gabriela TORO for the crimes mentioned above. A factual explanation supporting probable cause follows.

2.    The **Target Device** was seized on March 23, 2018 pursuant to an arrest of Gabriela TORO at the Otay Mesa, California Port of Entry for illegally importing approximately 13.38 kilograms (29.49 pounds) of cocaine in her vehicle. The **Target Device** was found among TORO's possessions when she was arrested. The **Target Device** is currently stored at 9495 Customhouse Plaza, San Diego, CA 92154.

3.    Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4.    The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this

28

1

investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code (USC), Section (§) 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, offenses numerated in Title 18, USC, § 2516.

6.    I am a special agent with the United States Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) and have been so employed since September of 2016. I am currently assigned to the Contraband Smuggling Investigations Group within the office of the Special-Agent-in-Charge (SAC) in San Diego, California, and have been a member of this unit since April of 2017.  Prior to my employment with HSI, I was a Deputy United States Marshal since April 2010. Prior to the U.S. Marshals Service, I was a Customs and Border Protection Officer at the San Ysidro Port of Entry from 2007 until 2010. Prior to that I was a United States Border Patrol Agent assigned to Ajo, Arizona from 2005 to 2007. I also previously served in the United States Army from 2000 to 2004. I also received a Bachelor of Arts degree in Religious Studies from Arizona State University.

7.    Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. This is particularly true in cases involving distributional quantities of hard narcotics, such as cocaine. Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on how to cross and where and when to deliver the

2

controlled substances. Narcotics smugglers and their organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones.

8.    Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.    Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.    Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.    Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.    Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.    Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.    Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.    The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not

3

limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

9. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

10. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

a. tending to identify attempts to import cocaine or some other federally controlled substance from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of cocaine or some other federally controlled substance from Mexico into the United States;

4

1     c.    tending to identify co-conspirators, criminal associates, or others involved
2          in the importation of cocaine or some other federally controlled substance
3          from Mexico into the United States;

4     d.    tending to identify travel to or presence at locations involved in the
5          importation of cocaine or some other federally controlled substance from
6          Mexico into the United States, such as stash houses, load houses, or
7          delivery points;

8     e.    tending to identify the user of, or persons with control over or access to,
9          the cellular/mobile telephone; and/or

10     f.    tending to place in context, identify the creator or recipient of, or
11          establish the time of creation or receipt of communications, records, or
12          data involved in the activities described above.

### FACTS SUPPORTING PROBABLE CAUSE

11.    On March 23, 2018 at approximately 4:04 p.m., Maria Gabriela TORO entered the United States at the Otay Mesa Port of Entry (POE) through the vehicle primary lanes. TORO was the driver, registered owner, and sole occupant of a 2010 Acura MDX bearing a California license plate.

12.    On March 23, 2018 at approximately 1604 hours, a Customs and Border Protection Officer (CBPO) was conducting pre-primary roving operations at the Otay Mesa Port of Entry. The CBPO approached TORO's Acura MDX, which was at a standstill in lane number 13. TORO was driving the Acura MDX. The CBPO received two negative declarations from TORO, who stated that she was going to Southgate, California. TORO told the CBPO that the reason she had gone to Tijuana to visit to the dentist. The CBPO then asked TORO if she was the owner of the vehicle, to which TORO replied "Yes". The CBPO next asked TORO if she recently had any mechanical work done to her vehicle, to which TORO replied no. The CBPO then instructed TORO to unlock the doors of the vehicle so an inspection could be conducted.

13.     As the CBPO inspected the trunk area, he noticed that the rubber gasket on the rear doorframe was not attached and has been torn. The CBPO informed TORO about the gasket, and TORO refused to look at the CBPO or respond to the CBPO's advisement. As the CBPO continued to speak to TORO, he noticed that TORO's right hand was visibly shaking and that TORO continued to avoid eye contact. At that moment, the CBPO decided to ask for assistance from a Canine Enforcement Officer (CEO) with a Narcotics and Human Detection Dog (NHDD). While the NHDD was screening the vehicle being operated by TORO, the NHDD displayed a positive alert to the rear trunk/cargo area of the vehicle. The CBPO obtained the single vehicle key from TORO and instructed her to step out of the vehicle. TORO was handcuffed and escorted to the security office for further disposition.

14.     In secondary inspection, the vehicle was driven through the Z-Portal X-Ray machine, which revealed abnormalities in the rear cargo floorboard of the vehicle.

1.     A CBPO then conducted a 7-point inspection of the Acura MDX, ten packages in a non-factory compartment were found in the rear cargo area of the Acura MDX. A subsequent test using the Gemini narcotics testing device, produced positive results for the properties of cocaine. In total, ten packages containing 13.38 kilograms of cocaine were removed from the 2010 Acura MDX.

15.     At approximately 6:30 p.m., Homeland Security Investigations (HSI) Special Agent (SA) Errol Watson and HSI SA Thomas Garrity spoke with TORO at the Otay Mesa Port of Entry. Prior to the start of any questioning pertaining to any violation of any law, SA Watson gathered biographical information as listed on DEA Form 202. Once this was completed, SA Watson advised TORO of her Miranda rights as listed on the ICE Form 73-025. SA Watson instructed TORO to not only read along, but to also initial each line to demonstrate her understanding. At the completion of the advisement, TORO declined to speak with HSI SA Watson and Garrity and requested legal counsel. The interview was immediately concluded at 6:40 p.m.

6

16.    The **Target Device** was discovered and seized by CBP at the time of TORO's arrest.

17.    During my follow-up investigation, I ran records checks for TORO and her 2010 Acura MDX and reviewed materials found in her 2010 Acura MDX. Crossing history records for both TORO and her 2010 Acura MDX show that TORO first crossed her 2010 Acura MDX on February 21, 2018 and had crossed her vehicle five times prior to her arrest. Based on a vehicle registration found in the 2010 Acura MDX, TORO had registered that vehicle in her name on February 20, 2018.

18.    Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe that TORO likely used the **Target Device** to coordinate the importation of a federally controlled substance into the United States. In addition, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information may be stored in the memory of the **Target Device** which may identify other persons involved in narcotics trafficking activities. Accordingly, based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics smuggling activities of TORO, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

19.    Finally, I also know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. In my professional training, education, and experience, I have learned that this requires planning and coordination in the days, weeks, and often months prior to the event. Given this, I request permission to search the **Target Device** for items listed in Attachment B beginning on December 23, 2017, up to and including March 23, 2018.

//

**METHODOLOGY**

20.     It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

21.     Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the **Target Device** and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

22.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques,

1  including manual review, and, consequently, may take weeks or months. The personnel
2  conducting the identification and extraction of data will complete the analysis within
3  ninety (90) days, absent further application to this court.

4  **CONCLUSION**

5      23.     Based on all of the facts and circumstances described above, including the
6  location of the cocaine, the amount of cocaine, and TORO's crossing history, there is
7  probable cause to conclude that TORO used the **Target Device** to facilitate violations
8  of Title 21, United States Code, Section(s) 952 and 960.

9      23.     Because the **Target Device** was promptly seized during the investigation
10 of TORO's smuggling activities and has been securely stored, there is probable cause
11 to believe that evidence of illegal activities committed by TORO continues to exist on
12 the **Target Device**.  As stated above, I believe that the date range for this search is from
13 January 20, 2018 through March 23, 2018.

14     24.     WHEREFORE, I request that the court issue a warrant authorizing law
15 enforcement agents and/or other federal and state law enforcement officers to search
16 the items described in Attachment A, and the seizure of items listed in Attachment B,
17 using the methodology described above.

18     I swear the foregoing is true and correct to the best of my knowledge and belief.

19
20
21                                    Special Agent Errol R. Watson Jr.
                                      HSI Special Agent
22

23 Subscribed and sworn to before me this ___/5___ day of June, 2018.

24
25
26 _____
   Hon. William V. Gallo
27 United States Magistrate Judge

28